(115 So. 21)

SNODGRASS et al. v. SNODGRASS. (8 Div. 887.)

Supreme Court of Alabama. Nov. 3, 1927.

Rehearing Denied Jan. 12, 1928.

**1. Equity** ⬅427(1)—Decree requiring reformation of deed as to land not within pleadings and litigated issues held error.

In suit for reformation of deeds confirming parol partition of lands between tenants in common, decree requiring reformation of deed as to land not within pleadings or litigated issues of fact *held* error.

**2. Boundaries** ⬅37(5)—Evidence held to sustain finding that parties to parol partition acquiesced in boundary as ascertained by surveyor.

In suit for reformation of deeds confirming parol partition of lands between tenants in common, evidence *held* to sustain finding that parties to partition agreement acquiesced in boundary as ascertained by surveyor, so as to bind them.

**3. Partition** ⬅5—One party having gone into possession of land set apart by parol partition, other parties and successors are estopped to repudiate agreement.

Where respective parties, by parol partition followed by exclusive possession in severalty and exercise of ownership, go into possession of land set apart to them by other joint owners, such other parties in interest and in partition agreement and their successors in title are estopped to repudiate agreement accomplished by respective surrender and taking possession in severalty; there being no fraud or bad faith.

⬅For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**4. Evidence ⚞5(I), 23(2), 43(2)—Supreme Court takes judicial notice of its records in same case, of general established facts and tract book of government surveys.**

The Supreme Court takes judicial notice of its own records in the same case and of general, public, and established facts and of tract book of government surveys.

Appeal from Circuit Court, Jackson County; W. W. Haralson, Judge.

Bill in equity by Texas Snodgrass and others against J. D. Snodgrass, and cross-bill by respondent. From the decree, complainants appeal. Corrected and affirmed.

See, also, 212 Ala. 74, 101 So. 837.

Ernest Parks, of Scottsboro, for appellants.

The decree was in error in holding there was no estoppel on the part of appellee with reference to the line of the Caroline Snodgrass dower lands and the Swink lands. 21 C. J. 1113; Snodgrass v. Snodgrass, 212 Ala. 74, 101 So. 837; Ivy v. Hood, 202 Ala. 121, 79 So. 587; Chappelear v. McWhorter, 204 Ala. 269, 85 So. 386. When parties to a deed select descriptive terms for the conveyance of a designated tract of land, which are insufficient to effect this clear purpose, equity will reform the description so as to effect a conveyance of the lands agreed and intended to be conveyed. Hathaway v. Carnley, 198 Ala. 39, 73 So. 382; Snodgrass v. Snodgrass, supra; Hammer v. Lange, 174 Ala. 337, 56 So. 573. It was error for the court to include in its decree a tract of land that was not included in the pleadings and proof. Hodge v. Joy, 207 Ala. 198, 92 So. 171; Snodgrass v. Snodgrass, supra. Calls for courses and distances must, in case of conflict, yield to calls for natural and artificial objects. Where such objects have disappeared and their disappearance and location have been accounted for, they control courses and distances. 9 C. J. 170, 216. Where lines of several surveys conflict, the lines of the elder survey will generally be made to prevail. An ancient survey is presumed to be correct when so accepted and treated by the parties. Snodgrass v. Snodgrass, supra; Ford v. Bradford, 212 Ala. 515, 103 So. 549; Chambless v. Jones, 196 Ala. 175, 71 So. 987. Each party to the oral partition is estopped from claiming that the true line is somewhere else than the old lines by which the division was made. 9 C. J. 171.

D. P. Wimberly and Proctor & Snodgrass, all of Scottsboro, for appellee.

Estoppel is a protective and not an offensive weapon. Its operation should be limited to saving harmless or making whole the person in whose favor it arises. 21 C. J. 1118. Where the description in a deed is equally applicable to two tracts of land, one only of which the grantor owns, it will be presumed that he intends to convey the tract to which he has title. 18 C. J. 278. Before an estoppel can be raised there must be certainty to every intent and the facts alleged to constitute it are not to be taken by argument or inference. 21 C. J. 1130; 16 Cyc. 748.

THOMAS, J. This is the second appeal. 212 Ala. 74, 101 So. 837. Upon reversal the parties by amendment and agreement reshaped the pleading or the effect thereof, and in some respects extended, and added to, the maps exhibited, incorporated in the evidence a later survey, and the description of the Snodgrass deed of 1871 is changed from "170" to "17." The testimony was retaken and more fully developed.

[1] The decree is in error requiring reformation of a deed as to any tract of land not specifically within the pleadings and litigated issues of fact. We have been unable to find that the S. E. ¼ of the S. E. ¼ of section 24, township 4, range 6 E., Huntsville meridian, or a part thereof, is within the issues presented, and yet a part of that quarter section is required to be included in the conveyance from complainants to respondent. The elimination of this tract of land from the bill, answer and cross-bill, and agreement of counsel indicates that it should not have been the subject of the decree in Snodgrass v. Snodgrass, 212 Ala. 74, 76 (2–5) 101 So. 837. In the answer and cross-bill it is recited:

"The respondent should further show unto the court that the following described portions of the Swink lands which have always been a part of the Swink lands, to wit: "The S. E. ¼ of the N. E. ¼, Sec. 24, T. 4, R. 6; the N. E. ¼ of the S. E. ¼, Sec. 24, T. 4, R. 6; the S. E. ¼ of the S. E. ¼, Sec. 24, T. 4, R. 6; and a portion of the N. W. ¼ of the S. E. ¼, Sec. 24, T. 4, R. 6—are not involved in the present suit, and are expressly eliminated from this suit for the following reasons:

"(1) Said lands above described adjoin lands owned by Texas Snodgrass individually.

"(2) Texas Snodgrass individually has laid claim to a portion of the lands last described, and since the institution of the present suit has wrongfully taken possession of a portion of said lands, and has erected fences on that portion of the lands so claimed by her.

"(3) A suit is now pending between J. D. Snodgrass and Texas Snodgrass, individually, to fix and determine the true boundary line between said above-described lands and the lands adjoining, which are owned by Texas Snodgrass individually. * * *

"* * * And also the true boundary line between the Caldwell 80 in the W. ½ of the N. E. ¼, Sec. 24, T. 4., R. 6., and the Swink lands in the N. W. ¼ of the S. E. ¼, Sec. 24, T. 4, R. 6."

[2] The several amendments thereafter did not make these lands the subject of reconveyance. A dividing line of the "Caldwell 80" is eliminated by agreement of counsel as being the subject of other inquiry. The question

of whether or not the west line thereof was eliminated by the agreement of counsel was the subject of confusion, as attested by the argument of appellants' counsel. A consideration of the agreement merely eliminated the south line of that 80, and left before the court the west line thereof. It being by government survey may occasion some confusion; it being rectangular, the change of one side may effect the other. Within the issues now presented we will consider the evidence as to the west line, or agreed west line thereof.

It is without dispute that the Caldwell 80 (W. ½ of the N. E. ¼, Sec. 24, T. 4, R. 6 E.), with other lands of that place, was allotted to W. E. Snodgrass on partition in 1912 of the N. H. Snodgrass lands among the several tenants in common, by commissioner whose report is of date of October 3 of that year. The depositions of Mr. Hall as to the purpose and extent of the survey that he made of certain of said lands that were allotted to J. Thomas Snodgrass, and his receipt for the compensation paid him by J. D. Snodgrass, as guardian, for such service, show that the survey was made, or services rendered, in August or September of 1913. The date of that receipt is October 15, 1913. It is apparent that the commissioner from the chancery court for the partition or allotment of the N. H. Snodgrass lands, and as a part thereof the Caldwell place, to W. E. Snodgrass, and of which was the W. ½ of the N. E. ¼ of Sec. 24, said township and range, was not influenced by the Hall survey of the controverted line. In that report of October 3, 1912, the Caldwell place, as set apart to W. E. Snodgrass, is described as follows:

"Caldwell place, described as follows: W. ¼ of N. W. ¼, and S. W. ¼ of section 13, S. ½ of N. E. ¼ of E. ½ of S. E. ½, section 14, and W. ½ of N. E. ¼, section 24, all in township 4, range 6 east, containing 480 acres more or less."

Counsel for appellants insist that the Hall survey was to establish the respective holdings of the parties immediately affected by the partition, as well as its primary object to ascertain the areas of cultivated lands in the determination of the amounts due for rents on the J. Thomas Snodgrass lands that were contiguous to complainants' Caldwell 80. In response to this contention respondent says neither he nor his ward was bound as to title by such lines that may have been taken or run by Hall, after the allotment by the commissioner; all parties in interest not being present. In a sense, the parties here were interested in the ascertainment of tillable land; yet that survey, without more, could not affect the title of the minor, J. Thomas Snodgrass, to lands in the E. ½ of the N. W. ¼ of section 24. The pertinent inquiry then is: Did the parties to the allotment by the commission, acting as it did in 1912, thereafter acquiesce in Hall's ascertainment of their lines along the west side of the Caldwell 80 (east side of Swink 80) from 1913 to and after the death of J. Thomas Snodgrass in 1917, and to the date of the partition of his lands in 1919, so to bind them to the result of the Hall survey?

[3] In Betts v. Ward, 196 Ala. 248, 253, 72 So. 110, this court said of such settlements and partition of real property that, where the respective parties in interest, by parol partition followed by the exclusive possession in severalty and the exercise of ownership, had gone into such possession of the land set apart to them by the other joint owners, such other party or parties in interest and in agreement by partition, and successors in title (no bad faith and fraud being pleaded), are estopped in equity to repudiate the agreement accomplished by the respective surrender and taking of possession in severalty of the several allotments. This estoppel is rested on the ground that such possession and acquiescence constituted a part performance, and that the interest of such party seeking to reopen the partition and allotment has ceased to exist in equity, and that it would be unjust and not in accord with the administration of equitable principles, in the absence of fraud or inequitable conduct, to repudiate such consummated agreement of partition and settlement of the rights in and growing out of the common property. Oliver v. Williams, 163 Ala. 376, 50 So. 937; Hodge v. Joy, 207 Ala. 198, 203, 92 So. 171; Hollis v. Watkins, 189 Ala. 292, 297, 298, 66 So. 29; Yarbrough, Adm'r, v. Avant, 66 Ala. 526; Freeman on Cot. & Part. 398; Welchel v. Thompson, 39 Ga. 559, 99 Am. Dec. 470; Lacy v. Gard, 60 Ill. App. 72; Weed v. Terry, 2 Doug. (Mich.) 344, 45 Am. Dec. 257; Kennemore v. Kennemore, 26 S. C. 251, 1 S. E. 881; LeBourgeoise v. Blank, 8 Mo. App. 434; Allen v. Seawell (C. C. A.) 70 F. 561; Whaley v. Dawson, 2 Schoales & L. 367.

Observation made on former appeal appears to have been on the assumption that the Hall survey had relation to the allotment, or was made pursuant thereto. The receipt before us and the evidence relating to the time and circumstances of that survey place it in the late summer or early fall of 1913, and about a year after the allotment of the N. H. Snodgrass lands to the several brothers and the widow of decedent.

Some of the commissioners testified that the exact land lines (of which was the west line of the W. ½ of the N. E. ¼ of section 24 of said township and range) were not located or not considered by the commissioners to be material in the setting apart of these lands, as was done from the deed and as indicated to them by Gant and Gullatt.

The agreement of counsel excluded the south line of the Caldwell 80, for the reasons stated, viz:

"And that the said bill be further amended by striking out the following from the prayer of the said bill: 'And also the true boundary line between the Caldwell 80 in the W. ½ of the N. E. ¾, section 24, T. 4, R. 6, and the Swink land in the N. W. ¼ of the S. E. ¼, section 24, T. 4, R. 6,' where the same occurs in lines 14, 15, and 16 on page 10 of the respondent's substituted answer and cross-bill.

"And it is further agreed that the location of the true boundary line between the Caldwell 80, which is the W. ½ of the N. E. ¼, section 24, T. 4, R. 6, and the Swink lands in the N. W. ¼ of the S. E. ¼, section 24, T. 4, R. 6, be left out of the litigation, and not determined in this cause, inasmuch as the dispute as to this line can be settled in a cause now pending in the circuit court of Jackson county, Ala., wherein Texas Snodgrass individually is complainant and J. D. Snodgrass is respondent, and it is the desire of all parties concerned that the location of this line be eliminated from the present suit."

It can readily be seen that this excluded the south line of that 80, and included the west line thereof as a litigable question of fact. And to a decision thereof we are of opinion that there is nothing in the testimony to indicate that before the settlement of these parties there was any fixed line between that 80 and the Swink lands to the west of it, or any recognized line between those lands by its prior owners and holders or by these parties, other than the true west line of the W. ½ of the N. E. ¼ of section 24 of said township and range.

The reason for and the rule creating estoppel, in a court of equity, touching lands, were adverted to by this court on the former appeal (Snodgrass v. Snodgrass, 212 Ala. 74, 80, 101 So. 837; Ivy v. Hood, 202 Ala. 121, 79 So. 857; Farrow v. Sturdivant Bank, 181 Ala. 283, 287, 61 So. 286); and one claiming under or through another who is bound by an estoppel is affected and bound by it. Goetter v. Norman, 107 Ala. 585, 19 So. 56; Fields v. Killion, 129 Ala. 373, 29 So. 797; Patterson v. Weaver, 114 So. 301.[1] The general authorities on estoppel, the elements, extent, or limits of the rule, are collected in 21 C. J. p. 1204, § 206.

[4] This court takes judicial knowledge of its own records in the same case (N. C. & St. L. R. Co. v. Crosby, 194 Ala. 338, 70 So. 7), and of general, public, and established facts, and of the tract book of government surveys (Hodge v. Joy, 207 Ala. 198, 92 So. 171).

A rod, perch, or pole, according to (Davies) school arithmetics is 16½ feet or 80 rods, perches or poles to a quarter of a mile. The record calls in the Snodgrass deed of 1871 bear out the observations of its contents on former appeal. See page 118 of that record, as we understand that record to be. As it is now before us in a corrected form, it is materially different as affecting the calls for the east side of the lands being conveyed. Its

[1] 216 Ala. 686.

calls on the north and east side, to the river, being "thence east with north boundary line of said fractional section to a stake 161 poles 10 links S. 15 degrees E. O Mulberry X, S. 19 degrees O W 17 Gum S. 5 degrees 18 E. X N. 23 W. O 07 Elm thence south 43 poles and 19 links to a stake N. 83 degrees E. O 5 Ash X S. 39 degrees W. 12 Box Elder thence along down said river." This change, from "170" to "17," no doubt, is in conformity with the calls of that conveyance before the several surveyors, and not as incorporated in the former record as "170," interpreted by us from the context to mean 170 poles. If the last-named distance be added to the 43 poles and 19 links from the designated north point on the river, that appears to be fixed or agreed upon, the east side of the dower lands conveyed would be nearly closed, or to the old fence or recognized hedge row extending from said point in a northwesterly direction, as some of the witnesses said, toward the Gullatt Hollow or hill lands. This is the fact, on the assumption that the calls of the deed "on the west boundary line of said fractional section * * * to a stake being the north corner of said fractional section," thence east with north boundary line of said fractional section to the "mulberry corner," thence south. etc., are followed.

The purpose and effect of the introduction of this deed in evidence, with that from Caroline Snodgrass of dower, is not primarily to establish title, or its sufficiency as a link in the chain of title, but, with the other evidence, to establish the sites of the dower lands and its north and east boundary thereof.

That deed, as now incorporated in the transcript, is now interpreted by experienced surveyors, in the light of the established customs of old surveyors in designating corners of calls or areas, on examination of the original field notes and maps, supports the fact that there were two fractions of section 25; one lay in the N. E. ¼ and the S. E. ¼ of said section, and was designated as "A"; the other fraction was of the S. W. ¼ of said section, undesignated other than by its acreage, viz. "130.68." The surveys of Wall and Caldwell proceed on the assumption that the draftsman of the deed was following a survey of the south half of said fractional section and of "fractions A and B," as was the case. If this was the fact, the call of 161 poles and 10 links would extend east and west along the half section line to a point about one pole and 10 links east of and beyond the center of fractional section 25; that the last-named distance and point was on the north line of fraction, or S. ½ of said section 25; and that said call of the deed extended thence 43 poles and 19 links to the point of beginning. This is in accord with the north and east boundary line fixed by the court, for the dower lands, though it embraced an

area of about 66 or 67 acres rather than the area of 57½ acres named in the John Snodgrass deed of 1871, and that from Caroline Snodgrass of about the same date. The tract book shows that N. Henderson (August 21, 1830) entered the fractional quarter section of the S. W. ¼ of section 25. The witness Caldwell said of the description in the Snodgrass deed:

"The north part of fractional section 25, is, first—a reasonable explanation of that is the entry of that dower was made by Henderson, marked in the field notes as 'fractional A' and 'fractional B,' and that entry is divided between Tom Snodgrass and Gullatt, and he evidently put it 'fractional section' when it was 'fractional A or fractional B.' He puts here a persimmon and then a cross; the first surveyor we had in the county, a Mr. Lyden, had the field notes as made out by the original surveyor as they run the lines, those show that instead of the corner they abbreviated it with an 'X,' and instead of saying a corner, wherever you find that 'X' in this deed it means the corner."

This witness as a surveyor, as did county surveyor Wall, treated the appropriate call of the Snodgrass deed on its north line as meaning that of the half section line of said fractions of the section along the river. When so read, the conveyance embraces a tract of 66 or 67 acres, and is closed on all sides from and to the starting point. And there is evidence, contained in the present record, that supports the finding of the court in ascertaining and establishing the north and east lines of the dower land.

Whatever be the true line of the dower lands on said side or sides, the question recurs: Was the dividing line between the dower and Swink lands the same agreed upon by the parties to the partition, or was an estoppel raised in partition of the J. Thomas Snodgrass lands against the insistence on the line now established by the trial court? Did J. D. Snodgrass indicate to his brother or general agent a line along the old fence row, by or near the hackberry to the Gullatt uplands and north of the north river ferry road, so as to embrace the S. W. ¼ of the N. W. ¼ and the lands of the S. E. ¼ of N. W. ¼ south and west of a line drawn from the N. E. corner of the S. W. ¼ of the N. W. ¼ to the recognized starting point on the river bank in fraction A of section 25?

By agreement the respondent divided the J. Thomas Snodgrass lands into two tracts viz. the Swink land valued at $30,000; the other named tract valued at $23,000, equalized by payment in money. When or after this was given to W. E. Snodgrass or his wife, respondent tried to purchase the right of the first choice. That was declined, and resulted in complainant purchasing that right at $500, when it was exercised by the taking by complainant of lot No. 2. The respondent sought to buy the bottom land or to clear

controversy as to the north and east lines of the Snodgrass bottoms, or the dower land. This was declined by complainant.

The commissioners who divided the N. H. Snodgrass lands and set apart to J. Thomas Snodgrass the allotment or tract composed of the Swink land and the Caroline Snodgrass dower, with other lands, had the aid of Jeff Gant and Dave Gullatt to designate the sites of the respective lands to be divided. Said Gant, as a witness, said he indicated to the commissioners the line between the Swink land and the Snodgrass dower, went to the bank of the river, and showed them that line from the hackberry tree near the river, the old fence or fence row, and—

"told them the line run across the bottom to the hill as far as I knew about it; I told them I did not know much about the lines only just the way they had it; they divided up from the hackberry tree directly on to the hill; that is the way they looked through it, and the way we went to it.

"Q. Did you show them the corner up there on the hill or not? A. No, sir. * * *

"Q. Did you show them the line between the Swink land and the land known as the Gullatt upland? A. No, sir; not there then. We went to the Gullatt place after that. We went up there, and I showed them where the line was dividing the Swink land and the Gullatt up on the upland; there wasn't any line through the bottom. * * *

"Q. You know the lines between the Gullatt upland and the Swink place? A. I know them; I help run them out one time myself. * * *

"A. No, sir; the lands, we went around a part of the way between the Swink and Gullatt land when I was with the commissioners; we did not go to the river hill part of the line. I showed them the way it run and the way it crossed the road, and we followed it a little piece the best we could by the road.

"Q. You knew about where the lines were; I will ask you if there wasn't hedgerows where the land had been cleared on both sides of the line dividing the Swink place from the Gullatt upland? A. A part of the way there was, yes, and a part of the way there wasn't.

"Q. Now, we will get back to the line between the Swink land and the Snodgrass bottom; when did you first know the Swink land and the Snodgrass bottom land? A. Away back before I was grown."

This witness supports Mrs. Texas Snodgrass in the statement on which the estoppel was founded. He said:

"Q. When you first knew these lands nothing but the bottom was in cultivation? A. Just the bank lands, the highest lands we call it.

"Q. The highest lands were in cultivation? A. Yes, sir.

"Q. The rest of it on both sides of the line was in woods? A. Yes; running across the bottom, both sides.

"Q. Clear up to the hills? A. Yes, sir.

"Q. Now I will ask you, Mr. Gant, if you were not in company with Gardner and G. B. Caldwell, county surveyors, and the respondent J. D. Snodgrass and others when they were running out this land after the death of J. Thomas

Snodgrass, and if you have ever heard the respondent J. D. Snodgrass say anything about where the line was or if he had told anybody where the line was dividing the Swink land from the Snodgrass bottom? A. Yes; I heard him say.

"Q. Now, Mr. Gant, I will get you to state who was present on that occasion and where this statement was made. A. It was made between the first bridge leading from the hill over to the bottom out in a little swag down a row of corn.

"Q. You mean by that a row of corn that had been gathered? A. Yes; what I mean by that is a row of corn that had been gathered and broken down by the wagon; we got to there just across a little swag from that road right straight with the road; the road crooked and run around that way with the swag, and we got on the other side, and Jim looked back toward the bank of the river, and said, 'I told Tex right here was where the line was, but I was just joking.'

"Q. Did he point out—how far did that down row extend across from the river across to the hill? A. Just a little piece, a short row of corn, and the rows corresponded with the road, the corn rows were run across corresponding with the road.

"Q. Have you ever been to the Gullatt corner on the hill? A. Yes, sir.

"Q. I will ask you if the line he pointed out wasn't in line with the Gullatt corner? A. Yes, sir.

"Q. When was that, Mr. Gant? A. I don't recollect the date of it at all; there was me and George Caldwell and Looney Sisk, Clark Roberts, J. D. and Little Jim we call him, that is Jim's boy—we were all there together."

This statement on which the estoppel was held on first appeal to have been raised is now denied, or stated not to have been heard by the parties named to have been present—Caldwell, Sisk, and Roberts. The effect of these witnesses was that no such conversation was had or heard, and the same is denied by respondent.

Dave Gullatt, as a witness, said he knew the line that divides Tom Snodgrass' bottom on the north from the Swink place; that it proceeded by where the big hackberry tree stood over on the bank of the river and along a little ridge or picket fence to a ditch and "then you turn, and it goes straight across to Mr. Gant's line (east and west) away up on top of the hill" above John Cothran's house "close to the chestnut stump." This last monument—the chestnut stump—is admitted by the parties, and is a call in the Snodgrass deed of 1871.

The evidence of George Gant in the main corroborates that of Jeff Gant as to the north line of the dower. He said, in his best judgment, there were 40 acres that belonged to Tom Snodgrass north of the chestnut corner; that the line from the picket fence to Gullatt corner was about straight, and the land south and west thereof to the foot of the hills where Cothran lives was always known as the Caroline Snodgrass land; that he could not say "for sure whether it (the 40 acres to the north of chestnut corner) was Tom Snodgrass or Swink land"; always considered that it belonged to Tom Snodgrass, but "did not hear anybody say it"; that there was a 40 between the chestnut corner and the Gullatt 40. Having so testified, he was asked and answered:

"Q. One 40 between the chestnut corner and the Gullatt land? A. Yes, sir.

"Q. You don't know whose 40 that is? A. Just from the looks of it to study about it they couldn't be over 40 acres in there.

"Q. Now, isn't that the Swink land? A. No; I don't know I told you; I could not tell you; I could not testify about that. * * *

"Q. Mr. Gant, as I understand you, there is one 40 north of the chestnut corner running along the section line that you don't know about? A. No; I have done testified that I don't know whose that was. * * *

"Q. I will ask you if that 40 was ever known as a part of the Tom Snodgrass dower? A. I don't know; if it was, it was more than I knew anything about. * * *

"Q. Now the 40 I am talking about is the one 40 north of the chestnut corner you say you don't know about. Do you understand the forty I am talking about, the one the cribs are on? A. Yes; I understand that.

"Q. That is right north of the 40 you said you did not know anything about? A. I know all about that 40 I am telling you about, but there (are) is two 40's in there, and it is north of the chestnut corner too, but it is still on further. * * *

"Q. Were either of those two 40's ever known as the Tom Snodgrass dower? A. If they were, I never heard of it; I don't see how they could have been. * * *

"Q. Now, the 40 immediately north of the chestnut corner, you say it is your understanding that was the Tom Snodgrass land, but you don't know how you got that information? A. No; I told you what I said it looks to me; it seems to me there (are) is 40 acres of land in there. I just thinks to myself when I was on it I was on the Tom Snodgrass land. I did not know it then, and I don't know it yet."

This testimony was not in the record on first appeal.

Cothran testified that he cultivated land along the road to or near the middle of the forks of the roads to the mouth of the Gullatt Hollow. He was corroborated in this by Gant, Goosby, and by complainant. And Sisk located the point where respondent said he was going to build a fence, a point indicated on the map as the north half of section 25, and corroborated Goosby as to a strip of land cultivated by the latter.

The declarations of tenants, alleged to have been made by respondent, that they were upon lands that had been allotted to complainant, were of tenancies along the road to and near the fork thereof, and about where respondent stated to Spivey, in the presence of Sisk, as to about where the line was, is in the

nature of corroboration of the statement of Mrs. Snodgrass as to where the dividing line was. The statements are denied by respondent.

Map or resurvey by Wall indicates the difficulty of closing the area in question by former calls of the Snodgrass deed of 1871 and as interpreted on first appeal.

Louis Stewart stated that, when he was a boy old enough to work, they "cleared about 10 or 15 acres" that extended along the alleged line, and that it extended "up to the foot of the ridge," and that this was north of the "stakes" now set, and that Tom Snodgrass owned the land south of same; that the dividing line pointed to the hackberry tree and the picket fence across the lower end of the lake. The witness stated that John Snodgrass "run that line, and said we were getting (clearing) too low down" on the other land; that he was governed "by that old road up next to the Gullatt Hollow"; that there is now woodland south of that line on this upper side near the top of the ridge. He is positive that the elder Mr. Snodgrass "blazed out" the line for "us to work by," and instructed them to "cut to" said line so established or indicated; and that at the time there was a road through the bottom, and located substantially as now.

Commissioners Coffey and Larkin testified that they valued the Caroline Snodgrass lands at $2,500, or $50.00 per acre, and did not consider the land on the ridge at such price, and would not have valued ridge land at that price; could not say how they arrived at the acreage of the dower land as being 57½ acres, as indicated in the description; thought they were so advised by an inspection of the deed. These witnesses were explicit in the statement that they did not run any lines; merely inspected, valued, and allotted the lands by tracts. This is evidence that is different or new.

The witness Whitfield said that Caroline Snodgrass was the widow of Tom Snodgrass, Sr. There was a fraction over 57 acres in the Tom Snodgrass bottom, cleared from the slough. It reached to the Gullatt Hollow, and it seemed that some of the Caroline Snodgrass land was on the right of the road "coming home" and above or in the Gullatt Hollow; that the "road kinder forked around there," and Tom Snodgrass, Sr. (the brother of John Snodgrass, and the father of W. E. and J. D. Snodgrass), did not think he owned any land above the McGuinn Ferry fork of the road; that the lines of the Tipton and Gullatt lands were about a half of a mile, or a little over, up the hollow, and John Snodgrass rented some land to Peters on the ridge, coming out this way from the river. Witness did not know who owned the land above the road on the ridge; he fixed the

area of the dower lands at 57 acres and a fraction.

Caldwell lived there many years, knew the Tom Snodgrass, Sr., bottom, or the Caroline Snodgrass dower; surveyed and establishes the South line as does the court; stated that he has known the chestnut corner as being what was called the Gullatt corner, and never heard that the N. E. corner of the S. W. of the N. W. ¼ of section 25 was called the Gullatt corner. He explains the old Snodgrass deed of 1871 and the use of the X as meaning a corner.

The foregoing illustrates the difficulty, if not the impossibility, of locating the exact dividing lines as were held to exist by the former owners under the old deeds of 1871, if such there were. It further illustrates the grave injustice that may arise on accounting for reasonable rentals along the disputed boundary, and the necessity of having the same definitely determined before the partition was accomplished. It further illustrates the wisdom of a chancery court in the enforcement of consummated family agreements and partitions.

The record has been carefully examined, and we are not of the opinion that the trial court has committed error on the evidence and resurveys, etc., before it. The only error in the decree being the incorporation of the tract of land in question, that is beyond the pleading. The costs of the appeal are divided between the parties. The decree of the lower court is corrected as to the 40 eliminated. As corrected, it is affirmed.

Corrected and affirmed.

ANDERSON, C. J., and SOMERVILLE and BROWN, JJ., concur.

